UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DONALD K. DELISLE, §<br>§<br>§<br>    Petitioner, §<br>§<br>v. §<br>§<br>MICHAEL T. MALONEY, §<br>ET AL. §<br>§<br>    Respondents. §<br>§ | Civil Action No. 04-11096-JLT |

PETITIONER'S MEMORANDUM OF LAW

Under 28 U.S.C. § 2254(*d*), for Mr. Delisle to qualify for habeas review, he must

show that the decision of the Supreme Judicial Court (SJC) was contrary to, or involved

an unreasonable application of, clearly established Federal law, as determined by the

Supreme Court of the United States. This court must first ask whether the Supreme

Court has prescribed a rule that governs Mr. Delisle's claim. If so, this court must then

decide whether or not the SJC's decision is "contrary to" that rule. *See O'Brien v.*

*Dubois*, 145 F.3d 16, 20-21, 24-25 (1st Cir. 1998). The inquiry at this stage is whether

the Supreme Court rule "by virtue of its factual similarity (though not necessarily

identically) or its distillation of general federal precepts intended for applications to

variant factual situations" fairly requires a result in a particular case. *Id.,* at 24-25.

If there is no governing rule, this court must ask whether the SJC's use of existing

law involved an "unreasonable application" of Supreme Court precedent. *Ibid.* The

inquiry at this stage is whether the SJC's decision "appears objectively reasonable." *Id.*
at 25. To be "unreasonable," the SJC's "decision must be so offensive to existing
precedent, so devoid of record support, or so arbitrary, as to indicate that it is outside the
universe of plausible, credible outcomes." *Ibid.*; *see Vieux v. Pepe*, 184 F.3d 59, 63-64
(1st Cir. 1999).

### The precepts and analysis stated in *Minnesota v. Murphy*, 465 U.S. 420, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984), and the law governing the "classic penalty situation" in probation revocation cases provides governing rules for purposes of habeas review.

In *Murphy*, the Supreme Court unequivocally stated that "[o]ur decisions have
made clear that the State could not constitutionally carry out a threat to revoke probation
for the legitimate exercise of the Fifth Amendment privilege." *Id.,* at 438, 104 S.Ct. at
1148. The narrow issue was whether a probationary condition that Murphy be truthful
with his probation officer "in all matters," *id.,* at 422, 104 S.Ct. at 1139, improperly
forced him to choose between incriminating himself and jeopardizing his probation.
*Murphy* held that the probationary condition did not improperly burden Murphy's Fifth
Amendment privilege because it did not require him "to choose between making
incriminating statements and jeopardizing his conditional liberty by remaining silent."
*Id.,* at 436, 104 S.Ct. at 1147.[1]   The probationary condition merely required Murphy to

---

[1] *Compare Chapman v. State*, 115 S.W.3d 1, 8-9 (Crim. App. Tex. 2003) (upholding conviction stemming from self-incriminating statements made by probationer in court-ordered sex offender therapy where the probationary condition required that he participate in therapy in good faith, fulling disclosing information relevant to his therapy); *with State v. Eccles*, 179 Ariz. 226, ___, 877 P.2d 799, 801 (1994) (striking down express probationary condition that forced Eccles to "choose between incriminating himself and losing his probationary status by remaining

speak truthfully about matters relevant to his probationary status and contained "no

suggestion that his probation was conditional on his waiving his Fifth Amendment

privilege"; it did nothing more than proscribe false statements, placing Murphy in the

same situation as any witness required to testify. *Id.,* at 437, 104 S.Ct. at 1147.

*Murphy* carefully distinguished the "classic penalty situation" in which a

probationer is not "free to admit, deny, or refuse to answer." *Id.,* at 429, 104 S.Ct. at

1143, citing *Garner* v. *United States*, 424 U.S. 648, 657, 96 S.Ct. 1178, 1183, 47

L.Ed.2d 370 (1976). The rationale here is that the State itself has prevented voluntary

invocation of the Fifth Amendment by threatening to penalize the individual should he or

she invoke it. *Murphy*, 465 U.S. at 434, 104 S.Ct. at 1145-1146, citing *Garner*, 424 U.S.

at 661, 96 S.Ct. at 1186. *Murphy* explained:

> The *threat* of punishment for reliance on the privilege distinguishes cases
> of this sort [*i.e.*, the "classic penalty situation"] from the ordinary case in
> which a witness is merely required to appear and give testimony. A State
> may require a probationer to appear and discuss matters that affect his
> probationary status; such a requirement, without more, does not give rise to
> a self-executing privilege. The result may be different *if the question put to
> the probationer, however relevant to his probationary status, calls for
> answers that would incriminate him in a pending or later criminal
> prosecution.* There is thus *a substantial basis in our cases* for concluding
> that if the State, either expressly *or by implication*, asserts that invocation
> of the privilege would lead to revocation of probation, it would have
> created the classic penalty situation, the failure to assert the privilege would
> be excused, and *the probationer's answers would be deemed compelled*
> and inadmissible in a criminal prosecution.

*Murphy*, 465 U.S. at 435, 104 S.Ct. at 1146 (emphasis added).

_____

silent").

*Murphy* further explained:

> [A] State may validly insist on answers to even incriminating questions and hence sensibly administer its probation system, as long as it recognizes that the required answers may not be used in a criminal proceeding and *thus eliminates the threat of incrimination.* Under such circumstances, a probationer's "right to immunity as a result of his compelled testimony would not be at stake," *Uniformed Sanitation Men Assn. v. Commissioner of Sanitation*, 392 U.S. 280, 284, 88 S.Ct. 1917, 1919, 20 L.Ed.2d 1089 (1968), and nothing in the Federal constitution would prevent a State from revoking probation for a refusal to answer that violated an express condition of probation or from using the probationer's silence as "one of a number of factors to be considered by the finder of fact" in deciding whether other conditions of probation have been violated. *Lefkowitz v. Cunningham*, 431 U.S. 801, 808 n.5, 97 S.Ct. 2132, 2137 n.5, 53 L.Ed.2d 1 (1977).

*Murphy,* 465 U.S. at 435 n.7, 104 S.Ct. at 1146 n.7 (emphasis added).

**The SJC's decision concluding that unconstitutional compulsion was lacking was contrary to the governing rules stated above in that (*a*) Mr. Delisle was at all times required by a special probationary condition to remain in the Emerge program; (*b*) implicit in that requirement was an additional requirement that he abide by all of Emerge's conditions necessary to prevent his expulsion from the program; (*c*) Emerge's letter requirement, originally stated as a necessary condition of his remaining in the program and expressly reaffirmed as such by Emerge personnel the day before Emerge decided to expel Mr. Delisle, required him to make disclosures of abuse that incriminated him in pending and later criminal prosecutions; (*d*) if Mr. Delisle failed to comply with Emerge's letter requirement and was expelled from the Emerge program, he then faced the realistic threat of probation revocation proceedings and imprisonment; and, moreover, (*e*) Emerge, as a State-certified batterer intervention program authorized to receive court referrals, was legally required by Massachusetts regulations to pass along Mr. Delisle's disclosures of abuse to his probation officer and Suffolk Superior Court.**

The SJC acknowledged that wholly apart from formal proceedings, the Fifth

Amendment "privileges [an individual] not to answer official questions put to him in any

other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings." 440 Mass. at 143, 794 N.E.2d at 1196, quoting *Murphy*, 465 U.S. at 426, 104 S.Ct. at 1141. But the SJC then went on to hold that because Emerge, and not the Commonwealth, imposed the letter requirement, Mr. Delisle's Fifth Amendment rights were not implicated. 440 Mass. at 143-145, 794 N.E.2d at at 1196-1197. The SJC reasoned there was no unconstitutional compulsion because (*a*) the Emerge requirement was a condition to readmission to the program, (*b*) "[t]he consequence for [Mr.] Delisle's not writing the letter was the possibility that he would not be readmitted by Emerge," 440 Mass. at 144, 794 N.E.2d at 1197, and (*c*) the decision whether or not to institute probation revocation proceedings lay with Mr. Delisle's probation officer and the ultimate decision to revoke ultimately lay with Suffolk Superior Court, and not with Emerge, *ibid.*, 794 N.E.2d at 1197.

The touchstone for analysis of alleged violations of the Fifth Amendment privilege against self-incrimination is the presence *vel non* of compulsion. *See McKune v. Lile*, 536 U.S. 24, 36, 41, 122 S.Ct. 2017, 2026, 2029, 153 L.Ed.2d 47 (2002). The privilege "protects against any disclosures that the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used." *Kastigar v. United States*, 406 U.S. 441, 445, 92 S.Ct. 1653, 1656, 32 L.Ed.2d 212 (1972), citing *Hoffman v. United States*, 341 U.S. 479, 486, 71 S.Ct. 814, 818, 95 L.Ed. 1118 (1951). "[T]he [Fifth Amendment] privilege does not turn upon the type of proceeding in which its protection is invoked, but upon the nature of the statement or

admission and the exposure which it invites." *Estelle v. Smith*, 451 U.S. 454, 462, 101

S.Ct. 1866, 1873, 68 L.Ed.2d 359 (1981). "To sustain the [Fifth Amendment] privilege,

it need only be evident from the implications of the question, in the setting in which it is

asked, that a responsive answer to the question or an explanation of why it cannot be

answered might be dangerous because injurious disclosures could result." *Hoffman*, 341

U.S. at 486-487, 71 S.Ct. at 817-818.

   The SJC's analysis leaves out three determinative facts. First, as a special

probationary condition imposed by Suffolk Superior Court, Mr. Delisle was required at

all material times to remain in the Emerge program. On January 28, 1998, the Suffolk

Superior Court entered a special probationary condition that Mr. Delisle "[r]emain in

[the] Emerge [p]rogram per order of the [c]ourt." Appt. Br. Rec. App. at 16. Then, on

December 14, 1998 – *after Mr. Delisle received notice of Emerge's November 17, 1998,*

*requirement that write a letter disclosing all his abuse of Ms. Delisle and before he had*

*complied* (III, 20)– the same court entered another special probationary condition

affirming that "[a]ll previous [p]rob[ation] requirements are in effect" and adding a

requirement that Mr. Delisle "[m]ust bring document proof of Emerge attendance and

submit to [his] [s]upervision [o]fficer at least once every 14 days." App. Br. Rec. App. at

17. After receiving Emerge's November 17, 1998, letter, Mr. Delisle attended a group

session on December 8, 1998 (I, 18-19). When Mr. Delisle went to an Emerge group

session on December 15, 1998, Currence (Mr. Delisle's group session leader) told him he

would be expelled if he did not submit the letter in a week's time (I, 21-22).

Second, Mr. Delisle was threatened with, and later subjected to, probation revocation for his failure to "[w]rite a letter stating all [his] abuse of [his wife] Anita Delisle, the effects of each act on [her], and how each occurrence could have been avoided." 440 Mass. at 140, 794 N.E.2d at 1193-1194. The very first ground Currence gave in his December 16, 1998, letter[2] for expelling Mr. Delisle from the Emerge program was Mr. Delisle's failure to comply with the letter requirement. And, at the revocation hearing, the judge relied on expulsion from the Emerge program based on the three grounds Currence gave, beginning, "I find as a fact that the defendant was terminated from the Emerge program, the grounds for which I find are that on December 15, 1998, he failed to write an essay concerning his abuse of Anita Delisle that had been requested of him. . . ." (IV, 78).

Third, Emerge was legally required by the terms of its State certification as a batterer intervention program authorized to receive court referrals to pass along to Mr. Delisle's probation officer and Suffolk Superior Court his disclosures of abusive conduct occurring both before and during therapy.[3] Undisputed evidence showed that

---

[2] A copy is attached. The Commonwealth's copy of the appellant's brief record appendix did not include pages 24 and 25.

[3] To bolster its argument that the consequences of Mr. Delisle's failure to comply with the letter requirement were too attenuated to rise to the level of unconstitutional compulsion, the SJC erroneously asserted, "Furthermore, the [Emerge] program's policies prohibited disclosure of the contents of such letters to anyone outside Emerge, including probation officers, without the permission of the participant." 440 Mass. at 143, 794 N.E.2d at 1196. The record provides no support for this assertion and, to the contrary, shows a close working relationship between Emerge and the Suffolk Superior Court probation department. As the following discussion shows, as a State-certified batterer intervention program authorized to receive court referrals, Emerge was required by Department of Public Health regulations to pass along Mr. Delisle's

Emerge was validly certified by the Department of Public Health as a batterer intervention program, and Currence so testified ( I, 14), and Emerge's website (cited in Com. Br. at 19-20 [http://www.emergedv.com]), so states. Only such State-certified batterer intervention programs are eligible for court referrals, and as a certified batterer intervention program, Emerge was required to conform to the *Massachusetts Guidelines and Standard for the Certification of Batterer Intervention Programs* (March 1995) (*Guidelines*).[4] *See Guidelines*, § 1.0, ¶ A. *Cf.* G.L. c. 209A, §§ 3 & 7.

As the Commonwealth itself points out (*see* Com. Br. 19-21 & n.10, citing *Guidelines* § 3.2, ¶ 1 & § 5.2, ¶ A) Emerge was required to pass along Mr. Delisle's disclosures of abuse of his wife to his probation officer and to Suffolk Superior Court. At the end of the "intake and evaluation phase," which could last as long as eight weeks, Emerge was required to

> provide the Chief Probation Officer or Probation Officer in Charge and the referring court with a written summary evaluation as *to the perpetrator's history and severity of abuse, description of violence as reported by the perpetrator, history of weapons used,* . . . and willingness to accept any conditions of acceptance into the program.

---

disclosures of abuse of his wife to his probation officer and Suffolk Superior Court. Indeed, the Commonwealth even quoted an excerpt from an article by David Adams, "founder and Program Director of Emerge," endorsing these regulatory requirements which, in the Commonwealth's words, Com. Br. at 21 n.10, require "that counselors report such [batterers'] disclosures [of abuse] to probation officers."

[4] The *Guidelines* are the product of a court-run commission established in 1991 under the mandate of St. 1990, c. 403, § 16 ("the Department of Public Health shall certify and monitor batterers' treatment programs according to the standards established and promulgated by the Commission"), specifically for court referrals. The original *Guidelines* were revised in 1995, and it is that revised version that was in effect in 1998 (as well as now). *See Guidelines,* Introduction. *See Addendum A.*

-8-

*Guidelines,* § 3.2, ¶ I(emphasis added).[5]  When the participant completes the program,

Emerge was required to

> provide a written summary to the appropriate Chief Probation Officer or Probation
> Officer in Charge and the referring court once all criteria have been met by the
> perpetrator. The discharge summary shall include information about the
> perpetrator's attendance and *history of abuse while in the program.*

*Guidelines,* § 5.2, ¶ A (emphasis added).  Moreover, among the criteria for program

completion was, "A perpetrator has accepted responsibility for violent behavior . . . ."

*Guidelines,* § 5.1, ¶ C.

The Commonwealth took the "extra, impermissible step," *Murphy,* 465 U.S. at

436, 104 S.Ct. at 1147,  by requiring Mr. Delisle to make potentially incriminating

disclosures under threat of having his probation revoked.  Unlike Murphy, Mr. Delisle

was not required merely "to appear and discuss matters that affect[ed] his probationary

status." *Murphy,* 465 U.S. at 435, 104 S.Ct. at 1146.  Emerge's letter requirement,

"however relevant to [Mr. Delisle's] probationary status, call[ed] for answers that would

incriminate him in a pending or later criminal prosecution." *Ibid.,* 104 S.Ct. at 1146.  If

Mr. Delisle's answers described abuse occurring before or during therapy, State

regulations required Emerge to pass them along to his probation officer and Suffolk

Superior Court.  If he failed to provide answers, he faced expulsion from the Emerge

---

[5]    As part of the intake and evaluation process, the participant was even required to enter
into an agreement which "shall, at a minimum, reflect: . . . [a]ppropriate waivers of
confidentiality." *Guidelines,* § 3.2, ¶ H(5).  There is no evidence whether or not Mr. Delisle was
required  to do this.

program and the "threat of punishment," *ibid.*, 104 S.Ct. at 1146, in consequent

probation revocation proceedings (which in fact occurred). The Commonwealth "by

implication" "assert[ed] that invocation of the privilege would lead to revocation of

probation" thus creating the "classic penalty situation." *Ibid.*, 104 S.Ct. at 1146. Thus,

Mr. Delisle's "answers would be deemed compelled" within the meaning of the Fifth

Amendment. *Ibid.*, 104 S.Ct. at 1146.

**Even if "contrary to" review is not merited, the SJC's decision is "objectively unreasonable" in light of the precepts set out above.**

It "is appropriate in assessing the reasonableness vel non of the state court's

treatment of the contested issue" to refer to the decisions of lower Federal courts. *See*

*O'Brien*, 145 F.3d at 25. *Mace* v. *Amestoy*, 765 F. Supp. 847 (D. Vt. 1991) (*Amestoy*), in

which the court allowed a habeas petition, is virtually on point. In the corresponding

State court proceeding, *State* v. *Mace*, 154 Vt. 430, ___, 578 A.2d 104, 107-108 (1990)

(*Mace*), Mace pleaded guilty to one count of lewd and lascivious conduct regarding his

stepdaughter. As a special probationary condition, Mace was required to complete sex

offender treatment with a private therapist. *Id.*, at ___, 578 A.2d at 848. During

treatment, he admitted he had oral sex with his stepdaughter but he denied having sexual

intercourse. *Ibid.*, 578 A.2d at 848. Despite being advised by his counselor that his

denials interfered with successful completion of therapy, Mace persisted in his denials.

*Ibid.*, 578 A.2d at 848. Mace was surrendered on the ground that his persistent denials

rendered him unamenable to sex offender therapy, his probation was revoked, and he was

sentenced to serve a suspended sentence. *Mace*, 154 Vt. at ___, 578 A.2d 849. On

appeal, the Vermont Supreme Court agreed with Mace's contention that an admission of

sexual intercourse laid him open to prosecution for another offense under Vermont law,

but held that Mace had not shown "a realistic threat of self-incrimination," and affirmed

the order revoking probation. *Id.,* at ___, 578 A.2d at 108.

On habeas review, the *Amestoy* court rejected the Vermont Supreme Court's

conclusion that Mace had not shown a "realistic threat of self-incrimination," reasoning

that Mace "should not be left to the good intentions of the State when forced to

incriminate himself or face incarceration." *Amestoy*, 765 F. Supp. at 848. The *Amestoy*

court said:

> Contrary to the State's position, the State has the burden of eliminating the
> threat of incrimination. If the State wishes to carry out its rehabilitative
> goals in probation by compelling offenders to disclose their criminal
> conduct, it must grant them immunity from criminal prosecution.

*Id.,* at 851-852.[6]

Relying on *Murphy*, 465 U.S. at 435, 104 S.Ct. at 1146, the *Amestoy* court held

---

[6] The *Amestoy* court pointed out that under *Murphy*, the State had the option of
"insist[ing] on answers to even incriminating questions and hence sensibly administer its
probation system, so long as it recognizes that the required answers may be not be used in a
criminal proceeding and *thus eliminates the threat of incrimination.*" *Amestoy*, 765 F. Supp. at
852 (emphasis added), quoting *Murphy*, 465 U.S. at 435 n.7, 104 S.Ct. at 1146 n.7. *Cf. United
States v. Ross*, 9 F.3d 1182, 1191 (7th Cir. 1993) (2-1 decision), *revd. on other grounds*, 450
F.3d 144 (7th Cir. 1994) (holding that Fifth Amendment was not implicated where a probation
requirement prohibited the probationer from possessing firearms and a judge's inquiry during
revocation proceedings into the probationer's possession of prohibited firearms did not force him
to admit responsibility for any crimes). The Vermont Supreme Court later adopted *Amestoy*'s
rationale, holding in *State v. Cate*, 165 Vt. 404, ___, 683 A.2d 1010, 1019 (1996), that judicial
use immunity would be extended in such cases.

that Mace had been "deprived of his 'free choice to admit, to deny, or to refuse to

answer.'" *Amestoy*, 765 F. Supp. at 850, quoting *Garner*, 424 U.S. at 657, 96 S.Ct. At

1183. The *Amestoy* court held:

> The condition of [Mace's] probation, as interpreted, did go beyond a
> prohibition against falsehood. It actually required admission of sexual
> intercourse – a criminal act for which [Mace] could be prosecuted. He was
> threatened with, and later subjected to, probation revocation for his refusal
> to make such an admission. He was therefore placed in the "classic penalty
> situation" and the privilege became self-executing. . . . [¶] Once the
> potential for incrimination is shown, the person need not show an intention
> on the part of the government to commence a criminal prosecution. . . .
> Making the protection of the Fifth Amendment hinge on the likelihood of
> prosecution "would nullify the privilege." *United States* v. *Miranti*, 253
> F.2d 135, 139 (2d Cir. 1958). The petitioner could not possibly assess the
> likelihood of prosecution which is totally dependent upon the discretion of
> the State's attorney.

*Amestoy*, 765 F. Supp. at 851.

Also, though factual and procedural patterns vary, States have followed an

analysis closely parallel or identical to *Amestoy's* when disclosures required by therapy

programs, participation in which was mandated as a special probationary condition,

called for answers that could incriminate the probationer in a pending or later criminal

prosecution.[7] State cases rejecting that analysis typically turn on the lack of a realistic

---

[7]  *See, e.g., James v. State*, 75 P.3d 1065, 1072 (App. Alaska 2003) (while appeal from
denial of application for post-conviction relief was pending, a probationer "has valid reasons to
fear that discussing the facts surrounding his former convictions [in a court-mandated sex
offender therapy program] would force him to incriminate himself" and consequently he "has a
valid Fifth Amendment privilege not to be compelled to discuss [them]"); *State ex rel. Tate v.
Schwarz*, 257 Wis.2d 40, ___, 654 N.W.2d 438, 441 (2002) (probation was improperly revoked
for "failure to cooperate with [court-mandated] sex offender treatment" based on "resistance to
admitting sexual misconduct with the victim": "defendant . . . cannot be subjected to probation
revocation for refusing admit to the crime of conviction, unless he is first offered the protection
of use and derivative use immunity"); *In re Lineberry*, 154 N.C. App. 246, 255, 572 S.E.2d 229,

-12-

threat that the answers elicited in therapy could incriminate the probationer in a pending

or later criminal prosecution.[8]

**_Murphy_ does not require or permit upholding probation revocation even if the
record contains other grounds the trial court could have relied on to revoke
probation if the record reflects that the trial court in fact relied in part on a**

---

236 (2002) ("In finding that [delinquent] juvenile's refusal to admit guilt to the offenses was a
factor justifying his continued custody pending appeal, the trial court exposed [the] juvenile to
the classic penalty situation of choosing between the privilege against self-incrimination and
prolonged confinement . . . . Thus, the trial court's conclusion that [the] juvenile remain in
custody pending appeal based on [the] juvenile's refusal to admit to the offense for which he was
adjudicated delinquent violated [the] juvenile's constitutional right against self-incrimination");
_State v. Evans_, 144 Ohio App.3d 539, ___, 760 N.E.2d 909, 924 (2001) (juvenile residential
treatment center, by procuring incriminating statements from juvenile delinquent in the course of
therapy requiring him to complete a "commitment offense paper" detailing all the charged and
uncharged crimes he had committed, where failure to participate was in itself punishable by an
adjudication of delinquency and transfer to a more restrictive facility, placed the juvenile in a
classic penalty situation, so that the juvenile's Fifth Amendment privilege was self-executing);
_State v. Reyes_, 93 Haw. 321, 329, 2 P.3d 725, 733 (App. 2000) (while direct appeal is pending
"[c]ourt ordered programs that require convicted sex offenders to admit responsibility for the
offense of which they were convicted under threat of probation revocation and imprisonment
violate the [Fifth Amendment] privilege against self-incrimination"); _State v. Imlay_, 249 Mont.
82, ___, 813 P.2d 979, 985 (1991) ("it is clear . . . the defendant [whose probation was revoked
because he would not admit guilt to the offense of which he was convicted required for
admittance to a court-mandated therapy program] cannot be subjected to a penalty that he would
not otherwise be subjected to if he would simply admit his guilt"), _cert. granted sub nom._
_Montana v. Imlay_, 503 U.S. 905, 112 S.Ct. 1260, 117 L.Ed.2d 489, _cert. dismissed_, 506 U.S. 5,
113 S.Ct. 444, 121 L.Ed.2d 310 (1992).

    [8] _See, e.g., McComb v. State_, 32 Kan. App.2d 1037, ___, 94 P.3d 715, 721 (2004)
(revocation of a convicted defendant's post-release supervision on the basis of his refusal to
admit his guilt for the offense of which he was convicted in a therapy program mandated as a
condition of his release did not violate the Fifth Amendment privilege, distinguishing "cases
which hold that a probationer cannot be required to admit guilt [which] rely, in part, on the fact
that such individuals still face the possibility of incarceration for their crimes"); _State v.
Carrizales_, 191 Wis.2d 85, ___, 528 N.W.2d 29, 30-32 (App. 1995) (Fifth Amendment was not
implicated because the defendant had pleaded no contest and, in any case, his disclosures in
court-mandated therapy could only have been used for rehabilitative purposes); _State v. Gleason_,
154 Vt. 205, ___, 576 A.2d 1246, 1250 (1990) (defendant's plea of nolo contendere was the
functional equivalent of a guilty plea and so protections of double jeopardy removed any threat of
further prosecution stemming from the defendant's disclosure in court-mandated therapy of the
facts surrounding the offense of which he was convicted).

**violation of a probationer's Fifth Amendment privilege.**

The SJC also said that *Murphy* does not control is because Mr. "Delisle's probation was not revoked 'merely because [he] refused to make . . . disclosures concerning his own criminal conduct.'" 440 Mass. at 143, 794 N.E.2d at 1195, quoting *Murphy*, 465 U.S. at 439, 104 S.Ct. at 1148. But *Murphy* does not stand for the proposition that a trial court's unconstitutional reliance on a violation of a probationer's Fifth Amendment privilege when revoking probation may be excused on direct or habeas review if other grounds exist in the record to revoke probation if the trial court relied on them as well, especially where, as here, it is impossible to determine on the record what weight the trial court assigned to the unconstitutional ground. Nor does *Murphy* stand for the proposition that an otherwise unconstitutional burden on the exercise of the Fifth Amendment privilege is somehow mitigated by the presence of such other grounds. Rather, as in other Fifth Amendment cases, the proper course is either to reverse or to remand for further proceedings where the violation of the Fifth Amendment privilege does not play a role. *See Miranda v. Arizona*, 384 U.S. 436, 498-499, 86 S.Ct. 1602, ___, 16 L.Ed.2d 694 (1966).[9]

It is settled that "[t]he Due Process Clause of the Fourteenth Amendment imposes procedural and substantive limits on the revocation of the conditional liberty created by

---

[9] *Cf. Brewer v. Williams*, 430 U.S. 387, 406, 97 S.Ct. 1232, ___, 51 L.Ed.2d 424 (1977) (under Sixth Amendment a prisoner is entitled to release on habeas writ where officers made statements designed to induce confession after agreeing with defense attorney not to interrogate accused: "Although we do not lightly affirm the issuance of a writ of habeas corpus in this case, so clear a violation of the Sixth and Fourteenth as here occurred cannot be condoned." ).

-14-

probation." *Black v. Romano*, 471 U.S. 607, 610, 105 S.Ct. 2254, 2257, 85 L.Ed.2d 636 (1985) (citation omitted).   There are two procedural components to probation revocation proceedings: "(1) a retrospective factual question whether the probationer has violated a probationary condition; and (2) a discretionary determination by the sentencing authority whether violation of a condition warrants revocation of probation." *Id.*, at 611, 105 S.Ct. at 2257. Accordingly, among the procedural due process requirements are written notice of the claimed violations of probation and a written statement by the fact finder both as to the evidence relied on and the reasons for revoking probation. *See Gagnon v. Scarpelli*, 411 U.S. 778, 786, 93 S.Ct. 1756, 1761, 36 L.Ed.2d 656 (1973) (incorporating for probation revocation the due process requirements for parole revocation laid out in *Morrissey v. Brewer*, 408 U.S. 471, 489, 92 S.Ct. 2593, 2604, 33 L.Ed.2d 484 [1972]). These requirements are designed to assure that the probationer has notice of the violations at issue in revocation proceedings and to "assur[e] that revocation proceedings are based on accurate findings of fact and, where appropriate, the informed exercise of discretion." *Black*, 471 U.S. at 611, 105 S.Ct. at 2257, citing *Gagnon*, 411 U.S. at 785, 93 S.Ct. at 1761.[10]

---

[10] The constitutional requirement of written findings of fact both as to evidence and the reasons for revocation is anchored in the importance of an informed exercise of discretion of the relevant decision maker and the necessity for an adequate basis for review. *See Black*, 471 U.S. at 612-614, 105 S.Ct. at 2258-2259; *Morrissey*, 408 U.S. at 475, 92 S.Ct. at 2597. Massachusetts appellate courts hold that the written findings requirement is satisfied if the transcript of revocation proceedings accurately reflects the evidence relied on and the reasons for revocation. *See Commonwealth v. Durling*, 407 Mass. 108, 113-114, 551 N.E.2d 1193, ___ (1990) ; *Fay v. Commonwealth*, 379 Mass. 498, 504-505, 399 N.E.2d 11 (1980); *Commonwealth v. Morse*, 50 Mass. App. Ct. 582, 592-593, 740 N.E.2d 998, ___ (2000).

-15-

The trial court made no written statement of findings of violation and reason for revoking probation, but his statements from the bench were reduced to a transcript ( IV, 78-79). *See* Appt. Br. at 12; Com. Br. at 7. The trial court's findings of violation tracked *seriatim* Currence's December 16, 1998, letter faxed to Mr. Delisle's probation officer (*see* Appt. Br. Rec. App. at 24): (1) Mr. Delisle failed to comply with Emerge's requirement set out in their November 17, 1998, letter condition that he write a letter stating all his abuse of his wife (IV, 78); (2) Mr. Delisle failed to pay the $20 fee for the December 15, 1998, group session fee as contemplated by the November 17, 1998, letter by obtaining the fee from his wife (IV, 78);[11] (3) Mr. Delisle physically abused his wife on December 15, 1998, by "step[ping] on her foot and dr[iving] his knee into her leg, knowing that that action would cause her pain" (IV, 78-79).

In explaining his reason for revoking probation, as opposed to finding a violation, the trial court made clear that it based its decision solely on Mr. Delisle's failure to participate in the Emerge program and to heed its requirements:

> This I view as a public injury and I am more persuaded in this case about

---

[11] Emerge's November 17, 1998, letter prohibited Mr. Delisle from "accept[ing] money from Ms. Delisle for *your* weekly fee." Appt. Br. Rec. App. at 13 (emphasis in original). Currence's December 16, 1998, to Mr. Delisle's probation officer, said that Emerge had "recently come across information that suggests that Mr. Delisle has violated these conditions [set out in Emerge's November 17, 1998, letter] by physically abusing Ms. Delisle and stealing a sum of money from her which he used to pay his group fees." App. Br. Rec. App. at 24. But at the revocation hearing Ms. Delisle testified that she voluntarily gave Mr. Delisle her ATM card so he could withdraw the money for the $20 group session fee from her bank account, even though she knew of the Emerge requirement (III, 20, 33-34, 36). Before he left the December 15, 2004, Emerge group session Mr. Delisle insisted on paying the $20 (I, 23). During Currence's testimony, the trial court actually said that it was excluding the evidence regarding the $20 and that it did not consider the issue "a serious matter" (I, 29, 31).

the defendant's actions and inactions, after having been told to enter the
Emerge program, the reasons for entering the Emerge program, the reasons
for observing that program, the reasons for an enthusiastic participation in
the program, an attempt to reach this defendant to get him to understand his
underlying problems, which the evidence in this case shows, at least in part,
Mrs. Delisle stimulated. He didn't do it and he was given more than one
chance to do it. He didn't do it.

(IV, 81)

The SJC asserted that a "fair reading" supported the conclusion that that the [trial

court] revoked [Mr.] Delisle's probation not only because he was terminated from

Emerge, but also because he was convicted of violent offenses against his wife in Lynn

District Court, and because he assaulted his wife on December 15, 1998, on returning

from an Emerge session." 440 Mass. at 143, 794 N.E.2d at 1195-1996. It is true that the

trial court prefaced its findings of violation given above with what it described as

"rulings" that included mention of the Lynn District Court conviction: "I'm prepared to

find by a preponderance of the evidence that the Lynn District Court case was not

brought to the attention of Judge Quinlan [at the December 14, 1998, hearing]. That's a

ruling I've made" (IV, 78). But rather pointedly, after making this "ruling," the trial

court went on in its next words to say, "*I find as a fact* that the defendant was terminated

from the Emerge program" and went on to make the three findings described above, each

prefaced by "I find" (IV, 78-79 [emphasis added]). The "ruling" was thus intended to

resolve a procedural question whether or not the consequences of the conviction had

already been raised and decided during the December 14, 1998, hearing in Suffolk

Superior Court, where Mr. Delisle's probation had been extended and the special

-17-

probationary condition that he had remain in the Emerge program had been reaffirmed. *See* Appt. Br. Rec. App. at 17. It was not a finding of violation, and in any event, the trial court did not rely on the conviction as a reason for revoking probation in the second stage of the analysis.

The context of the trial court's statements shows that the trial court treated its finding that Mr. Delisle stepped on the toe of and kneed Ms. Delisle on December 15, 1998, after returning from an Emerge session was a subsidiary finding supporting the ultimate finding that Emerge had justifiably expelled Mr. Delisle. But there is a substantial question about whether Mr. Delisle had adequate written notice that this was to be considered as an independent ground of violation. The December 28, 1998, notice of surrender triggering the proceedings below referenced "terminated from the Emerge program" with an asterisk call to a foot note that read "report indicates additional domestic violence subsequent to receiving extended probation" without a date. *See* App. Br. Rec. App. at 21. The oblique reference "to additional domestic violence" could logically be read as an elaboration on the ground cited for the "termination," especially as it did not appear under the heading "alleged violations." *See ibid.* It would appear, therefore, that the trial court took the course least likely to raise an objection as to notice.[12] And in any event, the trial court did not treat the assault as a reason for revoking probation, except insofar as the assault bore on Emerge's justification for

---

[12]    This is not to say that the trial court might not have relied on the assault as an independent violation, both because it constituted a criminal act and a violation of a pending G.L. c. 209A abuse prevention order, but the notice of surrender listed neither.

expelling Mr. Delisle.

Where a trial court has combined an impermissible ground with a permissible ground for revoking probation, the correct procedure is either to to remand to the trial court for reconsideration of the decision to revoke probation excluding the impermissible ground, see *In re Lineberry*, 154 N.C. App. at 256, 572 S.E.2d at 236 (vacating and remanding for further proceedings where trial court erroneously based probation revocation in part on delinquent juvenile's refusal to admit guilt in court-mandated proceedings and it could not determined from the record what weight the trial court had assigned to that finding ), or to set aside the order revoking probation unconditionally, *see Yates v. United States*, 354 U.S. 298, 312, 77 S.Ct. 1064, 1073, 1 LEd.2d 1356 (1957), *overruled on other grounds*, *Burks v. United States*, 437 U.S. 1, 18, 98 S.Ct. 2141, 2150-2151, 57 L.Ed.2d 1 (1978) (where "the verdict is supportable on one ground, but not on another, and it is impossible to tell which ground the jury selected" the verdict must be set aside).[13]

---

[13] In probation revocation cases Massachusetts appellate courts do not employ the "right for any reason" rule of practice, whereby an appellate court is free to affirm a ruling on grounds different to those the trial court relied on if the correct or preferred basis for affirmance is supported by the record. *See, e.g., Commonwealth v. Kotlyarevskiy*, 59 Mass. App. Ct. 240, 244 n.3, 794 N.E.2d 1276, 1279 n.3 (2003). In probation revocation cases where the trial court's written findings indicate that it relied partly on inadmissible evidence or improper grounds the case is remanded for further proceedings with instructions to reconsider revocation in light of only admissible evidence or proper grounds. *See, e.g., Brown, petitioner*, 395 Mass. 1006, 1007, 480 N.E.2d 301, 302-303 (1985), *further proceedings, Commonwealth v. Brown*, 23 Mass. App. Ct. 612, 504 N.E.2d 668 (1987); *Commonwealth v. Joubert*, 52 Mass. App. Ct. 582, 592-593, 647 N.E.2d 1238, 1242 (1995). *Cf. Commonwealth v. Vizcarrondo*, 427 Mass. 392, 398, 693 N.E.2d 677, 682 (1998) (a decision supportable on one ground but unsupportable on another must be set aside when it is impossible to tell which ground was relied on), citing *Yates*, 453 U.S. at 312, 77 S.Ct. at 1073.

RELIEF SOUGHT

For the foregoing reasons, Mr. Delisle respectfully requests that a writ issue

unconditionally or, in the alternative, that this court cause to be entered an order to the

SJC requiring remand to the trial court for further proceedings.

Date: December 9, 2004.


William W. Adams
Mass. BBO No. 549406
*Attorney for the Petitioner*
203 Summit Street
Plainfield, Massachusetts 01070-0038
Tel (413) 634-0062
Fax (413) 634-0340

CERTIFICATE OF SERVICE

I hereby certify that on December 9, 2004, I cause to be served a true copy of the above Petitioner's Memorandum of Law to be served by first-class mail, postage prepaid, upon Ms. Natalie S. Monroe, Assistant Attorney General, One Ashburton Place, Boston, Massachusetts 02108.

Date: December 9, 2004.


William W. Adams
Mass. BBO No. 549406

-20-